STATE OF CONNECTICUT *v.* STANLEY WILLIAMS
(10645)

PETERS, C. J., HEALEY, SHEA, DANNEHY and SANTANIELLO, Js.

Argued March 11—decision released July 1, 1986

*Temmy Ann Pieszak,* assistant public defender, with whom, on the brief, were *Joette Katz,* public defender, and *Alan McWhirter,* assistant public defender, for the appellant (defendant).

*Marcia B. Smith,* assistant state's attorney, with whom, on the brief, was *John A. Connelly,* state's attorney, for the appellee (state).

ARTHUR H. HEALEY, J. On November 19, 1980, after a jury trial, the defendant was found guilty of the crimes of robbery in the first degree in violation of General Statutes § 53a-134 (a) (4),[1] conspiracy to commit robbery in the first degree in violation of General Statutes §§ 53a-134, 53a-48,[2] and false statement in viola-

---

[1] General Statutes § 53a-134 (a) (4) provides: "(a) A person is guilty of robbery in the first degree when, in the course of the commission of the crime or of immediate flight therefrom, he or another participant in the crime . . . (4) displays or threatens the use of what he represents by his words or conduct to be a pistol, revolver, rifle, shotgun, machine gun or other firearm; except that in any prosecution under this subdivision, it is an affirmative defense that such pistol, revolver, rifle, shotgun, machine gun or other firearm was not a weapon from which a shot could be discharged. Nothing contained in this subdivision shall constitute a defense to a prosecution for, or preclude a conviction of robbery in the second degree, robbery in the third degree or any other crime."

[2] General Statutes § 53a-48 provides in part: "A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy."

tion of General Statutes § 53a-157.[3] This appeal followed.

On appeal, the defendant claims that the trial court erred in: (1) overruling the challenge to the jury array from which his trial jury was selected;[4] (2) ruling that his coconspirator could invoke his privilege against self-incrimination if called as a witness at trial and that the defendant was not entitled to a continuance until his coconspirator had been sentenced; (3) failing to instruct the jury on the definition of larceny in accordance with General Statutes § 53a-119; and (4) misleading the jury in its instructions on conspiracy.

Certain background facts which the jury could reasonably have found include the following: On March 21, 1980, the Fournier Insurance Agency in the Oakville section of Watertown was robbed by the defendant's coconspirator, Elbert Roberson, who was armed with a handgun. Roberson asked the clerk for the agency's gray cash box, fled down the street with it, and was arrested shortly thereafter. On March 12, 1980, the defendant and his sister had gone to the Fournier agency, purchased some insurance and made a cash payment for it. At that time, the clerk who had dealt with the defendant had placed the cash she received from him in the same cash box that was taken by the robber on March 21, 1980. Approximately five minutes after the robbery, the defendant came into the insurance agency where the same clerk, who had observed him on March 12, 1980, was on duty. She recognized

---

[3] General Statutes § 53a-157 provides in part: "A person is guilty of false statement when he intentionally makes a false written statement under oath or pursuant to a form bearing notice, authorized by law, to the effect that false statements made therein are punishable, which he does not believe to be true and which statement is intended to mislead a public servant in the performance of his official function."

[4] Since we remand the case for a new trial on the ground of failure to grant a continuance, we need not discuss this challenge to the jury array.

him from that earlier transaction. He inquired of her whether the policy that he had earlier taken out in his sister's name covered towing because his car had been stuck down the street for a couple of hours.

In a statement given to the Watertown police, the defendant stated that on the night before the robbery, Roberson had asked the defendant to give him a ride to Oakville because "he had to throw down on something ['rob the place'] in Oakville for some big money." The next morning the defendant picked Roberson up and drove him to Oakville. Roberson gave him twenty dollars for driving him there so that he could rob "this place he was going to hit." A few minutes after Roberson exited the car in Oakville, he came back to tell the defendant that he was getting ready to commit the robbery and he showed the defendant his gun, flipping the cylinder so that the defendant could see bullets in it. The defendant asked Roberson not to commit the robbery at that time because his car would not start. The latter reiterated that he had to rob the agency and he walked toward the Fournier agency. There was also evidence that the defendant later gave a false statement to Watertown police officers.

The defendant claims error in the trial court's denial of his motion for a continuance in conjunction with its ruling concerning Roberson's claimed fifth amendment privilege against self-incrimination. The background circumstances involved are the following: On August 21, 1980, during the argument on the defendant's motion to sever his case from that of Roberson, the defendant's counsel indicated that he wanted Roberson to be available to testify for the defendant. This was a result of the state's response to the defendant's discovery motion seeking exculpatory information which stated: "The co-accused, Elbert Roberson, claimed not to have had an accomplice during this [r]obbery and claims not to know the Defendant." The

defendant's counsel, in seeking a severance, said that he wanted to call Roberson to have him tell the jury that he had acted without an accomplice and had not even known the defendant. The motion to sever the trials was granted on September 16, 1980.

On October 29, 1980, Roberson pleaded guilty to a substitute information charging him with robbery in the first degree in violation of General Statutes § 53a-134 (a) (4) and conspiracy to commit robbery in the first degree in violation of General Statutes §§ 53a-134, 53a-48. The court[5] accepted the pleas and sentencing was scheduled for December 12, 1980.

On October 30, 1980, jury selection began in the defendant's case. Later, on November 5, 1980, during jury selection, the defendant's counsel informed the court that Roberson was "very strongly" a possible witness in the case. At that time, he stated that he had received a letter from Roberson's attorney indicating that Roberson intended, if called, to invoke his fifth amendment privilege against self-incrimination and that this privilege, the attorney had informed the defendant's counsel, persisted until he was actually sentenced. Moreover, counsel also said that Roberson's attorney had told him that a motion to quash would be directed to any subpoena issued to Roberson, and, if that failed, Roberson just would not testify. The defendant's counsel said that Roberson, having pleaded guilty, had waived his right to self-incrimination, but pointed out that if the trial court agreed with Roberson's argument, then he asked that the trial not continue any further ("at least not proceed with the evidence") until after Roberson had been sentenced on December 12, 1980. The state opposed the request for a continuance, argu-

---

[5] The judge who accepted Roberson's guilty plea and who later sentenced him was the same judge who heard the motion to sever and who also presided at the defendant's trial.

ing that it was "hypothetical" at that time whether Roberson would even be called and if he were, whether he would exercise his privilege. It also maintained that Roberson's fifth amendment privilege lasted until he had been sentenced and that although the trial court had accepted Roberson's guilty plea, it might reject the state's recommended sentence. In the latter event, the state argued that then Roberson could be tried and, if he had already testified in the defendant's case, the state could use that evidence against him at his later trial. The state took this position although it acknowledged that Roberson had told the police that he had not had an accomplice and that he had not known the defendant; the state argued "that that [was] not the truth."[6] Just prior to the court's ruling, the defendant's counsel said that if it ruled in the state's favor, then the defense would have to seek a mistrial in the event the trial progressed to the point that Roberson would have to be called prior to his sentencing. The trial court denied the defense motion, pointing out that it could not act then as the matter was in the realm of speculation and could only act when the fifth amendment claim was actually made.

On November 12, 1980, Roberson was called as a witness by the defense after the trial court had denied his motion to quash defense counsel's subpoena. He was questioned in the absence of the jury to determine whether he would exercise his fifth amendment privilege although defense counsel persisted in his claim that Roberson had already waived it by pleading guilty. Roberson's refusal to answer a number of questions was sustained by the trial court because of his fifth

---

[6] The record is not clear here. The state referred to its prior "cross-examination" of Roberson where it maintained that he "admitted, in fact, he did know [the defendant]."

amendment privilege against self-incrimination.[7] The questions involved the crimes to which Roberson had pleaded guilty and certain of the crimes for which the defendant was then on trial.[8] Reiterating his earlier claims concerning the importance of Roberson as a witness to his case, as well as his efforts to alert the trial court to that fact, beginning at the pretrial motion stage, defense counsel then moved that all proceedings in the case be stayed until after Roberson's sentencing on December 12, 1980. This motion was denied, as was the defense motion to dismiss all the charges made immediately thereafter. The trial continued and the jury verdict of guilty was returned on November 19, 1980. The defendant was sentenced on December 12, 1980.[9]

[7] Initially, Roberson was asked if, on October 29, 1980, he had pleaded guilty to robbery in the first degree. He said, as he did to some questions: "I claim my rights against self-incrimination, I refuse to answer any questions."

Thereafter, his refusal to answer the following questions was sustained on the basis of his fifth amendment privilege:

"Q. Mr. Roberson, on March 21st of 1980, that was a Friday, at any time during that day did you have in your possession a weapon that was capable of discharging a shot? . . .

"Q. Mr. Roberson, on Thursday, March 20th, did you at any time have an occasion to meet with Stanley Williams? . . .

"Q. Mr. Roberson, at any time did you tell law enforcement authorities that you did not have an accomplice in this matter? . . .

"Q. Mr. Roberson, did Stanley Williams agree with you to rob the Fournier Insurance Agency on March 21st? . . .

"Q. Mr. Roberson, did Sharon Rabb know why you were going to the Fournier Insurance Agency that day? . . . [to] the Fournier Insurance Agency on March 21st of 1980? . . .

"Q. Mr. Roberson, did Stanley Williams pick you up in front of 2 Pilgrim Avenue on March 21st, 1980?"

[8] At the time Roberson was called by the defendant, the latter was being tried not only for the three crimes of which the jury eventually found him guilty, but also for the crimes of robbery in the first degree in violation of General Statutes § 53a-134 (a) (2) and hindering prosecution in violation of § 53a-166. At the close of all the evidence, the trial court granted the defendant's motion for judgment of acquittal as to the latter two crimes.

[9] We note that, according to the defendant, he had already served the sentence imposed in this case for which his maximum discharge date was December 15, 1985.

The trial court had, sometime prior to the trial, exercised its discretion in granting the defendant's motion to sever. See *United States* v. *Vigil,* 561 F.2d 1316 (9th Cir. 1977); 2 Wharton, Criminal Procedure (12th Ed. Torcia) § 303. It did so after the defendant had told the court that the state had disclosed, on a request for exculpatory information, that Roberson had told the police that he had no accomplice in the robbery and that the defendant intended to call Roberson as a witness in his case. The *Bruton* issue was also raised. See *Bruton* v. *United States,* 391 U.S. 123, 88 S. Ct. 1620, 20 L. Ed. 2d 476 (1968). "There is no duty to sever merely because potentially exculpatory testimony of a codefendant exists. The defendant-movant must desire to use it." *Byrd* v. *Wainwright,* 428 F.2d 1017, 1020 (5th Cir. 1970). These criteria were met here. More to the point, Roberson's statement to the police that he had no accomplice was "exculpatory in effect"; *Byrd* v. *Wainwright,* supra; *it meant that the defendant was not involved at all.* The state's claim at trial that this testimony of Roberson was not true is not focal because that issue is ultimately for the jury. See *Byrd* v. *Wainwright,* supra, 1021. The defendant's need to obtain exculpatory evidence from a codefendant has been found in some cases to be a proper ground for severance. See, e.g., *United States* v. *Shuford,* 454 F.2d 772, 776–77 (4th Cir. 1971); *United States* v. *Echeles,* 352 F.2d 892, 897–99 (7th Cir. 1965). In granting the severance, it is a fair assumption that the trial court recognized that a single joint trial, however desirable, viewed in the context of efficient and expeditious criminal adjudication, may not be had at the higher expense of a defendant's right to a fundamentally fair trial. *United States* v. *Echeles,* supra, 896.

At the outset of jury selection, the trial court heard the defendant's counsel announce to the jury panel that Roberson was a possible witness in the case. During

jury selection, on November 5, 1980, the defendant's counsel again alerted the trial court at length to his and Roberson's position on the self-incrimination privilege issue. In rejecting the defense claims,[10] the court also denied a continuance of the proceedings until after Roberson's sentencing.

The state proposed several reasons why the privilege against self-incrimination continued at least until sentencing. Roberson had, according to the state, pleaded guilty on October 29, 1980, on the basis of a recommended sentence. In the event that the sentencing court had rejected that recommendation, Roberson could have moved to withdraw his guilty plea and proceeded to trial. See Practice Book § 721 (3); *State* v. *Lasher,* 190 Conn. 259, 265, 460 A.2d 970 (1983). If this had been done, then the state might have been

---

[10] The defendant seems to argue that because Roberson had already pleaded guilty he had no fifth amendment privilege to invoke when called by the defendant as a witness on November 12, 1980. He argues that to hold that he did is contrary to our holding in *State* v. *Rado,* 172 Conn. 74, 372 A.2d 159 (1976), cert. denied, 430 U.S. 918, 97 S. Ct. 1335, 51 L. Ed. 2d 598 (1977). We do not agree.

In *Rado,* there is nothing in the opinion to indicate that the circumstances under which the witness was invoking the privilege were in issue or that the trial court was aware that he may not have been sentenced. The issue in *Rado* actually was the propriety of the state calling as a witness a codefendant who had pleaded guilty to one of the charges for which the defendant was on trial (two others having been nolled) whom it allegedly knew or should have known would refuse to testify. *State* v. *Rado,* supra, 77.

In *Rado,* we quoted the following statement of the Second Circuit: "It is well established that once a witness has been convicted for the transactions in question, he is no longer able to claim the privilege of the Fifth Amendment and may be compelled to testify." *United States* v. *Romero,* 249 F.2d 371, 375 (2d Cir. 1957). A reading of *Romero* discloses that the witness in that case had in fact been sentenced. Moreover, *Rado,* immediately following the quote from *Romero,* also cites *Reina* v. *United States,* 364 U.S. 507, 513, 81 S. Ct. 260, 5 L. Ed. 2d 249 (1960), and *Brown* v. *Walker,* 161 U.S. 591, 597-600, 16 S. Ct. 644, 40 L. Ed. 819 (1896). A reading of *Reina* makes evident that the witness in that case had in fact also been sentenced. In *Brown,* the witness involved had been immunized when called to the stand. In sum, *Rado* did not hold as the defendant appears to claim.

able to use the "incriminating" testimony he had given in a codefendant's trial in his own trial and this testimony could have substantively jeopardized his right to have the state prove him guilty beyond a reasonable doubt. See *State* v. *Tyson,* 43 N.J. 411, 416, 204 A.2d 864 (1964), cert. denied, 380 U.S. 987, 85 S. Ct. 1359, 14 L. Ed. 2d 279 (1965); *State* v. *McConnohie,* 121 Wis. 2d 57, 358 N.W.2d 256 (1984). Practically speaking, this would have amounted to self-incrimination. This is particularly so when it is remembered that in applying the required test for denying the invocation of the privilege it must be " *'perfectly clear,* from a careful consideration of all the circumstances in the case, that the witness is mistaken, and that the answer[s] *cannot possibly* have such tendency' to incriminate." (Emphasis in original.) *Hoffman* v. *United States,* 341 U.S. 479, 488, 71 S. Ct. 814, 95 L. Ed. 1118 (1951); *State* v. *Simms,* 170 Conn. 206, 209, 365 A.2d 821, cert. denied, 425 U.S. 954, 96 S. Ct. 1732, 48 L. Ed. 2d 199 (1976).

We add that a judge, appraising such a claim by a witness, "must be governed as much by his personal perception of the peculiarities of the case as by the facts actually in evidence." *Ex parte Irvine,* 74 F. 954 (S.D. Ohio 1896) (Taft, J.), quoted in *Hoffman* v. *United States,* supra, 487. We note that a defendant who has pleaded guilty but who is awaiting sentencing may invoke the fifth amendment privilege in order to prevent the possible enhancement of his sentence. *United States* v. *Wilson,* 598 F. Sup. 138, 142 (E.D. Pa. 1984) and cases there cited. Thus, the right to one's privilege against prosecution that could result from the testimony sought does not depend upon the likelihood of prosecution but upon the possibility of prosecution. *In re Folding Carton Antitrust Litigation,* 609 F.2d 867, 872 (7th Cir. 1979); see *United States* v. *Johnson,* 488 F.2d 1206 (1st Cir. 1973).

Having concluded that the trial court properly permitted the witness Roberson to refuse to testify in reliance on the privilege against self-incrimination, we must return to the propriety of the trial court's denial of a continuance when this event occurred. There is no question but that the "matter of a continuance is traditionally within the discretion of the trial judge" which will not be disturbed absent a clear abuse. *Ungar* v. *Sarafite,* 376 U.S. 575, 589, 84 S. Ct. 841, 11 L. Ed. 2d 921, reh. denied, 377 U.S. 925, 84 S. Ct. 1218, 12 L. Ed. 2d 217 (1964); *State* v. *Beckenbach,* 198 Conn. 43, 46, 501 A.2d 752 (1985). It is not every denial of a request for a continuance that violates due process. See *Ungar* v. *Sarafite,* supra, 589; *State* v. *Bethea,* 167 Conn. 80, 84, 355 A.2d 6 (1974). Thus, the right of a defendant to a continuance is not "absolute" and the propriety of a denial of one is to "be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied." *State* v. *Beckenbach,* supra, 47–48, quoting *State* v. *Bethea,* supra, 83, and *Ungar* v. *Sarafite,* supra, 589.

In this case, the trial court had been timely alerted to the defendant's claims concerning Roberson's testimony. His "exculpatory" testimony that he had no accomplice would hardly have been cumulative. Once Roberson was permitted to invoke his fifth amendment privilege during the defendant's trial, the unique interest that the defendant had in a continuance in order to get that testimony before the trial jury became more significant. "A criminal defendant is not entitled to a trial which guarantees to him 'every item of evidence he would like to offer, but one which meets constitutional standards of due process.' *Byrd* v. *Wainwright,* 428 F.2d 1017, 1021 (5th Cir. 1970)." *United States* v. *Blackston,* 547 F. Sup. 1200, 1207 (S.D. Ga. 1982). While the trial court could properly consider counter-

vailing factors such as the right to control its own docket and judicial economy; see generally *State* v. *Zeko,* 176 Conn. 421, 423, 407 A.2d 1022 (1979); the graver question in this case emerges: whether depriving the defendant of the opportunity to use the exculpatory testimony of Roberson amounted to prejudice resulting in the denial of due process and a fair trial.[11] See generally *United States* v. *Martinez,* 486 F.2d 15, 22 (5th Cir. 1973); *Ungar* v. *Sarafite,* supra; *State* v. *Beckenbach,* supra. The continuance requested here was not unreasonable under the circumstances of this case. It would have given the defendant the opportunity to confront Roberson after he had been sentenced, at a time when he could no longer have validly invoked his federal constitutional fifth amendment privilege against self-incrimination as to those crimes for which he was sentenced. On this phase, we hold specifically that Roberson's fifth amendment privilege against self-incrimination, with respect to the crimes to which he had pleaded guilty, continued until his sentencing for those crimes. See *Smith* v. *State,* 283 Md. 187, 388 A.2d 539 (1978), cert. denied, 439 U.S. 1130, 99 S. Ct. 1050, 59 L. Ed. 2d 92 (1979); *State* v. *Tyson,* supra; *Commonwealth* v. *Garland,* 475 Pa. 389, 380 A.2d 777 (1977); *State* v. *McConnohie,* supra, 65; note, "Plea of Guilty or Conviction as Resulting in Loss of Privilege against Self-incrimination as to Crime in Question," 9 A.L.R.3d 990. The prejudice to the defendant was substantial. The denial of the continuance constituted an abuse of discretion and the case is remanded for a new trial.

---

[11] The defendant also argues that the refusal to grant the continuance denied him, inter alia, his right to compulsory process. While our disposition of the continuance issue does not require that we discuss this claim further, we do note that we have said: "The rights of compulsory process and due process of law may be violated by the denial of a continuance which prevents a defendant from presenting witnesses on his behalf." *State* v. *Bethea,* 167 Conn. 80, 83, 355 A.2d 6 (1974).

The defendant's claim that the trial court committed constitutional error by failing to instruct the jury on the definition of larceny in accordance with General Statutes § 53a-119 requires little discussion in view of our disposition of this case. We need not review this claim. "We have held on numerous occasions that the court will not pass upon a constitutional question if there is present some other ground upon which the case may be decided." *Hartford* v. *Powers,* 183 Conn. 76, 84–85, 438 A.2d 824 (1981) and cases there cited, including *State* v. *Gold,* 180 Conn. 619, 639–40, 431 A.2d 501, cert. denied, 449 U.S. 920, 101 S. Ct. 320, 66 L. Ed. 2d 148 (1980). "Constitutional issues are not considered unless absolutely necessary to the decision of a case . . . or unless sufficient public interest warrants such a review." *State* v. *DellaCamera,* 166 Conn. 557, 560–61, 353 A.2d 750 (1974). These criteria are not present here. Moreover, review of this issue is also unnecessary since it will not affect the final result in this case. *Vogel* v. *New Milford,* 161 Conn. 490, 499, 290 A.2d 231 (1971). In addition, we do not believe that such an error, if any, will recur upon retrial and we therefore need not address this claim further. See *State* v. *Graham,* 200 Conn. 9, 19, 509 A.2d 493 (1986).

The same legal considerations also apply to the lack of the need to address the defendant's remaining claim that the trial court's instructions on conspiracy misled the jury and, thus, deprived him of his right to a fair trial.

There is error, the judgment is set aside, and a new trial is ordered.

In this opinion the other justices concurred.